UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BARBARA JERPE, et al.,

          NO. CIV. S-03-555 LKK/DAD

    Plaintiffs,

  v.                         O R D E R

AEROSPATIALE, et al.,

    Defendants.

    This is a product liability action arising from a helicopter crash. Plaintiffs allege that either a manufacturing or design defect in one of the helicopter's main rotor blades caused the blade to separate from the helicopter during flight, resulting in the crash. The blade at issue was distributed by defendant American Eurocopter Corporation ("AEC"). Pending before the court is defendant's motion for summary judgment and plaintiff's motion for a Rule 702 hearing. The court resolves the matter upon the parties' papers and after oral argument. For the reasons set forth below, the court grants in part and denies in part the motion for summary judgment and denies as moot the motion for a Rule 702 hearing.

1

# I. Facts[1]

Plaintiffs have brought negligence and product liability causes of action against defendant AEC, who manufactures and distributes aviation products. The action is based on alleged manufacturing and design defects in one of the main rotor blades (the "red blade") that caused the helicopter to crash into Honey Lake on March 21, 2002. Defendant's Statement of Undisputed Fact ("SUF") ¶ 1; Fourth Amended Compl. ("Compl.") ¶ 27. The pilot, Raymond Watson, died in the crash. Plaintiffs' decedent, Charles Jerpe, survived initially but later died. Compl. ¶ 8, 31.

Plaintiffs have designated Dr. Ramesh Kar to testify that the red blade contained defects. Plaintiffs originally designated Brian Wilson to testify as to the same, SUF ¶ 2, but soon after serving his Rule 26 report (and prior to deposition), Mr. Wilson died of a heart attack, SUF ¶ 3. Dr. Kar was subsequently designated to replace Mr. Wilson, and it is his opinion that defendant attacks as failing to create a genuine dispute regarding the existence of a defect. SUF ¶ 5.

Dr. Kar is a professional engineer with thirty years of experience in the fields of mechanical metallurgy, materials science, and failure analysis. Rule 26 Rep. of Dr. Ramesh Kar ¶ 1. He holds a Ph.D. in materials science and engineering from University of California at Berkeley. Id. Dr. Kar "tout[s]"

---

[1] Undisputed unless otherwise noted.

2

himself as a leader in composite failure analysis, SUF ¶ 7, and edited a book entitled *Composite Failure Analysis Handbook*, SUF ¶ 8. While not an aerodynamicist (i.e., one who specializes in aerodynamics), SUF ¶ 11, Dr. Kar claims to have a basic understanding of aerodynamic forces on aircraft component parts based on his course work in mechanical engineering.

In terms of Dr. Kar's relevant helicopter-related experience, he has previously consulted with composite helicopter blade manufacturers, but is not a helicopter blade design engineer, per se. SUF ¶ 12. In addition, his book covers composite helicopter rotor blades. Kar Decl. ¶ 7. Twenty years ago, he worked with the National Transportation Safety Board to examine a different Eurocopter rotor blade. SUF ¶ 14. He also once used laboratory equipment to identify porosity in a blade manufactured by a different company. SUF ¶ 13.

**A. Evidence of a Manufacturing Defect**

To prepare his Rule 26 report, Dr. Kar examined the reports prepared by other experts for the instant case, including their accompanying exhibits, such as x-ray and ultrasonic lab documents. SUF ¶ 17. He also visually inspected the helicopter wreckage and the red blade. SUF ¶ 17. Based on the reports and visual inspection, Dr. Kar's Rule 26 report stated that "[w]ork performed by Brian Wilson using X-ray radiography and ultrasonic methods clearly shows that the failed red blade was associated with indications of areas of debonding and delaminations in

3

areas approximately 2/3 span away from the attachment points."[2] SUF ¶ 19.  It further stated that "[t]hese are more likely than not manufacturing defects further exacerbated by in-service use of the blade as well as intrusion of moisture."  SUF ¶ 19.

Nevertheless, Dr. Kar added the caveat that he wanted "to perform destructive tests to unequivocally establish the exact nature of the manufacturing defects."[3]  SUF 19.  Dr. Kar did no tests or measurements to determine the location, size, or depth of the suspect areas of debonding and delamination.  SUF ¶ 24.  Similarly, Dr. Kar did not determine if the suspect areas were fragmented or continuous.  SUF ¶ 27.

Defendant maintains that Dr. Kar merely parroted the findings and opinions of Wilson, SUF ¶ 23, whereas plaintiffs maintain that Dr. Kar independently arrived at his conclusions.  His deposition testimony on this point is less than clear.  For example, Dr. Kar stated that "[t]he nondestructive tests performed by Mr. Wilson clearly showed that there are indications of manufacturing defects."  Kar Depo. 38:14-16, Decl. of Eric Strain, Ex. E.  He also stated, "I'm relying on Mr. Wilson's work."  Kar Depo. 49:12.  But, based on this, it is unclear whether Dr. Kar was merely relying on the same

---

[2] Delaminations are areas where composite layers have not joined together.  Kar Decl. ¶ 11.

[3] On March 13, 2007, the court denied plaintiffs' motion to modify the scheduling order, which would have extended the deadline for discovery and permitted the destructive testing to be conducted.

4

underlying data as Wilson, or if Dr. Kar was in fact repeating the opinions of Wilson.

Similarly, with regard to the ultrasonic data, Dr. Kar stated that they revealed that there were "anomalies," without clearly specifying whether he independently determined that there were anomalies, or if this was in fact the opinion of the ultrasound technician (who has not been properly disclosed as an expert). Kar Depo. 46:23-47:1. Likewise, when asked whether Mr. Wilson or the ultrasound technician had an exemplary blade available at the time of the ultrasound as a basis for comparison, he responded that he did not know, since he was not present for the tests. Kar Depo. 59:1-14. Instead, he offered the following:

> I do know that Mr. Wilson and his team of technicians have sufficient background and experience in testing composites where, when they run an A-scan, they say there's an indication of a defect here, and I'd tend to agree with them because they know what they're doing. It's certainly not a situation where you have an individual without the reputation of Mr. Wilson and his team of experts who are totally untrained and are just shooting in the dark. I don't think that's the case.

Kar Depo. 59:14-23.[4]

Dr. Kar's declaration, executed on March 20, 2007, provides a clearer explanation for the basis of his opinions. It stated:

> I personally examined the subject rotor blade. I personally examined the fractures and failure locations on the rotor blade. I examined the lab results (X-ray radiographs and ultrasonic data) and independently confirmed that the information that I saw in Mr.

---

[4] He also noted that defects can be detected without the aid of an exemplar. Kar Depo. 60:2-6.

5

>Wilson's report was accurate based on my own independent evaluation and verification.

Kar Decl. ¶ 21.  He also expressed that he had "sufficient information, knowledge, and evidence to support [his] opinion of the failure of the red blade causing the crash which is not dependent on destructive testing."  Kar Decl. ¶ 23.

**B. Evidence of a Design Defect**

Dr. Kar's Rule 26 report also indicated that he "concur[ed]" with the opinion of Mr. Wilson that the subject blades were most likely suitable for 5,000 hours of service, rather than the 20,000 hours specified by the manufacturer, because of the absence of Z-fibers.  SUF ¶ 50.  He explained that his work at Northrup demonstrated to him that resistance to fatigue and impact damage is increased by the use of Z-stitch methods.  SUF ¶ 50.  He stated that use of a Z-stitch would have more likely than not delayed the onset of failure beyond the 20,000 hour limit and that the red blade was therefore defective in design for failing to employ this method.  SUF ¶ 50.

There is no dispute that, in a draft of his report on the same day that the final report was signed, Dr. Kar did not mention Z-stitching; rather, he incorporated this discussion after talking to counsel for plaintiffs.  SUF ¶ 53.  Dr. Kar also stated that he had not done the testing necessary to determine where the Z-stitching would be incorporated.  SUF ¶ 56.  He also had no data about whether this blade, or any helicopter rotor blade, without Z-stitching had a history of

6

1  problems in the field. SUF ¶¶ 57-58. Finally, he conceded that
2  he had not conducted "any testing or research or calculations to
3  support Mr. Wilson's opinion that this [particular] blade should
4  only have a 5,000 hour life limit," SUF ¶ 62, but stated that he
5  had "done sufficient work on Z-stitched composite structures to
6  know there is significant improvement in the damage tolerance
7  resistance," Kar Depo. 78:8-10.

**C. Evidence of Causation**

With regard to the issue of causation, Dr. Kar stated that
the suspect areas of delamination and debonding caused the blade
to become unbalanced and tear from its attachment point on the
helicopter. Kar Depo. 112:17-21. He believed that based on the
macroscopic fracture features he observed on the blade's sleeve,
he could discern how the red blade failed. Kar Depo. 94:16-19.
He opined that the red blade separated from the helicopter in an
upward fashion. Kar Depo. 105:19-20. Nevertheless, Dr. Kar, as
noted earlier, is not an aerodynamicist. In addition,
plaintiffs have also designated two accident reconstructists,
William Llorente and Peter Leffe, who will testify as to how the
blade failed prior to impact with the water.

**II. Standard**

Summary judgment is appropriate when it is demonstrated
that there exists no genuine issue as to any material fact, and
that the moving party is entitled to judgment as a matter of
law. Fed. R. Civ. P. 56©; see also Adickes v. S.H. Kress & Co.,

7

398 U.S. 144, 157 (1970); <u>Secor Ltd. v. Cetus Corp.</u>, 51 F.3d 848, 853 (9th Cir. 1995).

> Under summary judgment practice, the moving party [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id.</u>  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>See</u> <u>id.</u> at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u>  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56©, is satisfied." <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

1  First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv.,
2  809 F.2d at 631.  Thus, the "purpose of summary judgment is to
3  'pierce the pleadings and to assess the proof in order to see
4  whether there is a genuine need for trial.'"  Matsushita, 475
5  U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's
6  note on 1963 amendments); see also Int'l Union of Bricklayers &
7  Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752
8  F.2d 1401, 1405 (9th Cir. 1985).

9      In resolving the summary judgment motion, the court
10 examines the pleadings, depositions, answers to interrogatories,
11 and admissions on file, together with the affidavits, if any.
12 Rule 56©; see also In re Citric Acid Litigation, 191 F.3d 1090,
13 1093 (9th Cir. 1999).  The evidence of the opposing party is to
14 be believed, see Anderson, 477 U.S. at 255, and all reasonable
15 inferences that may be drawn from the facts placed before the
16 court must be drawn in favor of the opposing party, see
17 Matsushita, 475 U.S. at 587 (citing United States v. Diebold,
18 Inc., 369 U.S. 654, 655 (1962) (per curiam)); See also
19 Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121,
20 1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn
21 out of the air, and it is the opposing party's obligation to
22 produce a factual predicate from which the inference may be
23 drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp.
24 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th
25 Cir. 1987).

26

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III. Analysis

Defendant's motion for summary judgment argues that Dr. Kar's opinions are inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), which require that expert opinions derive from facts or data and be based upon reliable methodology. For the reasons set forth below, the motion is denied with respect to the manufacturing defect claim and the issue of causation but is granted with respect to the design defect claim.

**A. Manufacturing Defect**

First, defendant moves for summary judgment on the manufacturing defect claim. Defendant argues that Dr. Kar's opinion as to this issue is not reliable and therefore fails to create a genuine issue of material fact. The principal basis for this attack is that Dr. Kar has impermissibly relied on the opinions of Mr. Wilson, rather than arriving at his own independent opinions. Defendant also argues that Dr. Kar's opinions do not flow from reliable methodology.

Federal Rule of Evidence 703 permits experts to rely on "facts or data" as a basis for opinions, even when not themselves admissible, so long as they are of a type reasonably relied upon by experts in the relevant field.  Fed. R. Evid. 703.  Nevertheless, experts may not solely rely on the opinions of other experts.  See, e.g., Turner v. Burlington Northern Santa Fe R.R. Co., 338 F.3d 1058, 1062 (9th Cir. 2003) (finding that an expert was not permitted to testify as to cause of a fire where the opinion was based on a different non-testifying expert's lab report that the fire was started by gasoline). Here, the issue is whether Dr. Kar's opinion that the red blade contained a manufacturing defect was based upon the "facts or data" contemplated by Rule 703, which would be permissible, or solely upon the opinion of Mr. Wilson, which would be impermissible.

The court finds that Dr. Kar's opinion, as set forth his Rule 26 report, was based on visual inspection, photographs, x-rays, and ultrasounds, which comprise "facts or data" that need not themselves be admissible in evidence.  As noted earlier, Dr. Kar's deposition testimony was somewhat ambiguous on the issue of whether he was merely relying on the same underlying data set produced at the direction of Mr. Wilson, or if he was relying on both that data set and the conclusions that Mr. Wilson drew therefrom.  Nevertheless, Dr. Kar's declaration clearly states that he independently arrived at his opinions by, for example, reviewing x-ray radiographs and ultrasonic data.  His reliance

on the data produced by X-ray and ultrasound technicians is of the type reasonably relied upon by experts in the field. <u>See</u> Kar Decl. ¶ 19. Moreover, the fact that Dr. Kar arrived at the same conclusion of Mr. Wilson does not mean that he simply parroted Mr. Wilson's opinion.

The court also finds that Dr. Kar's opinion as to the existence of the manufacturing defect is based upon reliable methodology. During deposition, Dr. Kar explained that "[i]n order to perform a failure analysis, you do visual; you do nondestructive tests, including ultrasonic, x-ray radiography, which has been done." Kar Depo. 41:19-22. <u>See also</u> Kar Decl. ¶ 12 ("The protocol to perform a composite failure evaluation encompasses 1) examination of the entire structure itself to determine global failure mode; followed by 2) visual macroscopic/microscopic evaluation of the fracture points of the failed components; supplemented with 3) field and laboratory non-destructive and destructive test methods *as and if determined to be necessary.*") (emphasis in original).

Defendant's attacks go to the weight that should be afforded to Dr. Kar's testimony, not its admissibility. For example, defendant faults Dr. Kar for not being able to explain how the blade became defective during the manufacturing process; for not being able to eliminate alternate causes of debonding and delamination; and for not being able to testify as to the condition of the blade when it left defendant's hands. These assertions do not prove that Dr. Kar's opinion -- which stated

13

that the "areas of debonding and delaminations . . . are more likely than not manufacturing defects" -- is based on faulty methodology.  Rule 26 Rep. of Dr. Kar ¶ 11.

For substantially similar reasons, the fact that Dr. Kar did not conduct destructive testing does not mean that his methodology was flawed, or that there is insufficient evidence from which a reasonable fact-finder could conclude that a manufacturing defect exists.  Dr. Kar stated that destructive tests would be necessary to determine "the exact nature of the defect, whether it's excessive porosity, delamination caused because of a contaminant in the composite, or excessive moisture during the curling stage."  Kar Depo. 48:15-19.  This information might augment plaintiffs' case but the existing facts and data supporting Dr. Kar's opinion are sufficient to create a triable issue as to the existence of a manufacturing defect.  In addition, it appears that at least some portions of the blade were already exposed and therefore did not require destructive testing.[5]  Kar Decl. ¶ 21.

Finally, Dr. Kar also expressed his opinion that the alleged delamination and debonding was caused by manufacturing

---

[5] Defendant argues that Dr. Kar's declaration is a "sham" declaration because it contradicts his deposition testimony that destructive testing was necessary to determine the exact nature of the defects. Plaintiff responds that the cited portions of the deposition testimony were referring only to the closed portions of the blade.  Part of the confusion is likely attributable to the fact that the same type of defect (debonding and delamination) is alleged to pervade both the closed and open/missing parts, which makes it difficult to determine if Dr. Kar was addressing defects in the former or latter.

14

defects as opposed to impact from the crash.  He explained the basis for his opinion: "The overall fracture morphology in these areas is totally inconsistent with impact caused by the blade hitting the water . . . Based on my knowledge of aerodynamics . . . the sudden loss of these portions of the helicopter blade would cause it to pitch up."  Kar Decl. ¶ 27(E).  He also stated that "there are [] portions of the blade which have exposed fractures available for examination and . . . that they did not fracture due to impingement with the water; but were gone well before the blade hit the water."  Id.  Dr. Kar's belief is that the red blade initially flew upward rather than outward, denting the "beanie" directly above it.  One of plaintiffs' experts testified that this was essentially impossible,[6] but this is the subject of a genuine dispute, making summary judgment inappropriate.

**B. Design Defect**

Defendant also moves for summary judgment with regard to the alleged existence of a design defect.  During his deposition, Dr. Kar confessed that he had not included any discussion of Z-stitching because "initially I was not very comfortable, since I had not looked at Z-stitched rotor blades."  Kar Depo. 146:20-22.  Nevertheless, at the eleventh hour, he

---

[6] Plaintiffs' expert, William Lawrence, stated that when he spoke with aerodynamicists and other experts about the possibility of the blade moving in an upward rather than outward fashion, "they basically just laughed at me."  Depo. of William Lawrence, Reply Decl. of Eric Strain, Ex. B, 261:6-12.

15

inserted an opinion regarding Z-stitching based on his conversations with Mr. Franecke, who assured him that his training, education, and experience was sufficient for him to testify on Z-stitching. SUF ¶ 53.

The court finds that Dr. Kar is not qualified to testify as to this issue. The most convincing evidence on this point stems from Dr. Kar's apparent discomfort with testifying on Z-stitching as it pertained to rotor blades on civilian helicopters. He also stated that he had no data about whether any helicopter rotor blade without Z-stitching had any problems, SUF ¶ 57, and that he had not conducted any testing to substantiate Mr. Wilson's opinion that the blade should only have a 5,000 hour life limit, SUF ¶ 62. In short, Dr. Kar can testify only to the benefits of Z-stitching at a high level of generality, which is insufficient to qualify him as an expert on this issue. Accordingly, the court grants defendant's motion with regard to the existence of a design defect.

**C. Causation**

Finally, defendant moves for summary judgment on the alternative ground that there is insufficient evidence to infer that the alleged defect caused the accident. Dr. Kar's testimony states that the suspect areas of delamination and debonding caused the red blade to become unbalanced and tear from its attachment point on the helicopter. Kar Depo. 112:17-21. He based this opinion on the fact that "the red blade demonstrates failure patterns in its composite attachment points

1  different than the other two blades." Kar Decl. ¶ 27.  In
2  combination with the expert opinions of plaintiffs' accident
3  reconstructionists, this is sufficient to create a genuine issue
4  of material fact.  Accordingly, the court denies summary
5  judgment as to the issue of causation.

### IV. Conclusion

In light of the foregoing, the court orders as follows:

1. The motion for summary judgment is GRANTED in part and DENIED in part.

2. The motion for a Rule 702 hearing is DENIED as moot.

IT IS SO ORDERED.

DATED: May 9, 2007.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

17